1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6

ICICLE SEAFOODS, INC.; and W.K.
WEBSTER (OVERSEAS), LIMITED,

7

Plaintiffs,

C21-1715 TSZ

8

v.

ORDER

9

BNSF RAILWAY COMPANY,

10

Defendant.

11      THIS MATTER comes before the Court on two contemporaneously filed motions,

12  one by defendant BNSF Railway Company ("BNSF") seeking partial summary judgment

13  limiting BNSF's liability for any actual loss or injury to cargo, docket no. 27, and the

14  other by plaintiffs Icicle Seafoods, Inc. ("Icicle") and W.K. Webster (Overseas), Limited

15  ("Webster") requesting summary judgment against BNSF on both liability and damages,

16  docket no. 28.  Having reviewed all papers filed in support of, and in opposition to, both

17  motions, the Court enters the following Order.

18  **Background**

19      This case concerns spoiled fish.  In November 2020, Bellingham Cold Storage

20  ("BCS"), which operates a rail-served warehouse in Bellingham, Washington, *see*

21  Roques Decl. at ¶ 1, BNSF Ex. N (docket no. 27-15), acting on Icicle's behalf, arranged

22  with BNSF to transport 3,000 cases of frozen pollock to Taunton, Massachusetts, *id.* at

23

ORDER - 1

¶¶ 8–13 & Ex. 1; _see also_ Rowan Decl. at ¶ 2 (docket no. 29).  Icicle's customer, Channel

Fish Processing Co., rejected the shipment because of "temperature abuse during the

transportation."  Rowan Decl. at ¶ 3 (docket no. 29).  Icicle tendered a claim to its marine

cargo insurer, Allianz Global Corporate & Specialty North America ("Allianz"), and

received payment in the amount of $246,786.65.  Dunlop Dep. at 34:15–37:16, BNSF

Ex. B (docket no. 27-3); _see_ Subrogation Receipt, BNSF Ex. W (docket no. 33-5).

Icicle's rights against BNSF were assigned to Webster, which is an insurance claim

adjusting firm employed by Allianz.  Dunlop Dep. at 28:18–29:2 & 29:10–13, BNSF

Ex. B (docket no. 27-3); _see_ Subrogation Receipt, BNSF Ex. W (docket no. 33-5); _see_

_also_ Anderson Dep. at 17:9–24 & 31:23–32:2, BNSF Ex. A (docket no. 27-2) (indicating

that Webster has a contract with Allianz to serve as a third-party administrator,

performing "insurance claims review and investigation" on behalf of the insurer, and that

Icicle assigned its freight damage claim to Webster).

     In this subrogation action, Webster pursues, on behalf of Allianz, the sum of

$247,335.65, which includes $228,690 for the value of the rotten fish, $3,400.65 for labor

and $14,696 for disposal costs at the destination, and $549 in freight fees paid to BNSF.

_See_ Compl. at ¶ 3.6 (docket no. 1).  Webster asks the Court to enter summary judgment

against BNSF in these amounts.  BNSF denies liability on the grounds that neither Icicle

nor Webster can establish the pollock was in good condition at the point of origin and had

not been damaged while at BCS's storage facility.  _See_ Def.'s Resp. at 18–19 (docket

no. 33).  BNSF further seeks to limit its liability to $50,000.  _See_ Def.'s Mot. (docket

no. 27).

ORDER - 2

1    **Discussion**

2    **A.      Summary Judgment Standard**

3           The Court shall grant summary judgment if no genuine issue of material fact exists

4    and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

5    To survive a motion for summary judgment, the adverse party must present affirmative

6    evidence, which "is to be believed" and from which all "justifiable inferences" are to be

7    favorably drawn.  _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 255, 257 (1986).  When

8    the record, however, taken as a whole, could not lead a rational trier of fact to find for the

9    non-moving party on matters as to which such party will bear the burden of proof at trial,

10   summary judgment is warranted.  _See_ _Beard v. Banks_, 548 U.S. 521, 529 (2006); _Celotex_

11   _Corp. v. Catrett_, 477 U.S. 317, 322 (1986); _Matsushita Elec. Indus. Co. v. Zenith Radio_

12   _Corp._, 475 U.S. 574, 587 (1986).

13   **B.      The Carmack Amendment**

14          BNSF is a rail carrier that is subject to the provisions of the Carmack Amendment

15   to the Interstate Commerce Act.  The Carmack Amendment was enacted in 1906 to

16   "relieve cargo owners 'of the burden of searching out a particular negligent carrier from

17   among the often numerous carriers handling an interstate shipment of goods.'"  _Kawasaki_

18   _Kisen Kaisha Ltd. v. Regal-Beloit Corp._, 561 U.S. 89, 96, 98 (2010) (quoting _Reider v._

19   _Thompson_, 339 U.S. 113, 119 (1950)).  The legislation did so in two ways of relevance to

20   this matter:  (i) by codifying the common law rule that, although a carrier is "not an

21   absolute insurer," it is "liable for damage to goods transported by it unless it can show

22   that the damage was caused by '(a) the act of God; (b) the public enemy; (c) the act of the

23

1   shipper himself; (d) public authority; [or] (e) . . . the inherent vice or nature of the

2   goods,'" *Mo. Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 137 (1964); and (ii) by

3   "constrain[ing] carriers' ability to limit liability by contract," *Kawasaki*, 561 U.S. at 98.

4       1.   **Burdens of Proof Regarding Liability**

5           Pursuant to federal jurisprudence interpreting the Carmack Amendment, a prima

6   facie case for damage to a shipment is established when a shipper shows (i) the cargo was

7   in good condition when it was delivered to the carrier, (ii) the freight was in damaged

8   condition when it arrived at its destination, and (iii) the amount of damages.  *Mo. Pac.*

9   *R.R.*, 377 U.S. at 138.  If the shipper satisfies these three elements, the burden shifts to

10  the carrier to prove that (A) it "was free from negligence," and (B) the damage resulted

11  from one of the above-enumerated causes (for example, the shipper's conduct or the

12  nature of the cargo).  *Id.*

13          Plaintiffs contend that BNSF has conceded liability, citing BNSF's letter to Icicle

14  dated January 6, 2021, which reads in relevant part:

15          Upon review, *rail carrier liability has been established*.

16          However, in order for BNSF to conduct its investigation into the handling of
            this shipment, it will be necessary to furnish additional documentation
17          verifying loss or damage. . . .

18          Without the requested documentation, *BNSF Cargo Claims has no further*
            *recourse but to decline your claim*.  When the proper documentation is
19          received, this claim can be given prompt handling.

20  Pls.' Ex. I (docket no. 28-5) (emphasis added).  BNSF responds that, contrary to

21  plaintiffs' bald assertion, this letter does not obviate the need for plaintiffs to establish

22  that the pollock was in good condition when it was loaded into BNSF's railcar.  The

23

ORDER - 4

1    Court agrees.  BNSF's letter is, at best, equivocal, and it contains no admission about the

2    status of the cargo at either its point of origin or its destination.

3          The first sentence of the letter, indicating that "rail carrier liability has been

4    established," was based on temperature records provided to BNSF by Thermo King.  *See*

5    Mathewson Dep. at 51:23–52:5 & 59:2–7, Pls.' Ex. F (docket no. 34-1).  According to

6    the temperature records, the refrigeration unit for the rail car at issue was in the "Off"

7    status from November 20, 2020, while it was in Fridley, Minnesota, until after it arrived

8    in Taunton, Massachusetts, on December 4, 2020.  *See* Pls.' Ex. G (docket no. 28-3); *see*

9    *also* Mathewson Dep. at 57:6–58:10 & 58:21–25, Pls.' Ex. F (docket no. 34-1).  Although

10   this information reveals "temperature abuse" during transit, it does not demonstrate that

11   the product was in good condition when it was loaded into the rail car, and plaintiffs, as

12   the moving parties, are not entitled to have a reasonable inference drawn in their favor

13   from the temperature evidence.[1]

14   _____

15   [1] In anticipation of and/or in response to BNSF's letter denying Icicle's claim, Webster retained
     Claims Management Services, Inc. ("CMS") to conduct an inspection of the damaged cargo and
16   determine if it could be salvaged.  *See* CMS Report, Pls.' Ex. H (docket no. 28-4).  According to
     CMS, Tony Shardella (the manager at the cold storage warehouse in Taunton, Massachusetts, to
17   which the pollack had been consigned) reported that, when the railcar arrived at the facility, the
     tank had no fuel, the refrigeration unit was not running, and the pulp temperature on the product
18   was 28 degrees.  *Id.*  CMS's report further indicated that Shardella had heard from the engineer
     on the train that the railcar passed three checkpoints during the trip without any problem being
19   detected.  *Id.*  BNSF challenges the contents of CMS's report as being both inadmissible hearsay
     and unreliable.  Def.'s Resp. at 19 (docket no. 33).  BNSF does not, however, suggest that
20   Shardella and/or the train engineer could not be produced as witnesses at trial or that either of
     them would testify inconsistently with the statements attributed to them in CMS's report.  Thus,
21   the Court has considered CMS's report, but notes that Shardella's statement about the fuel level
     is contradicted by the Thermo King temperature records, which show that, on December 4, 2020,
22   the fuel was at 72%, *see* Pls.' Ex. G (docket no. 28-3), and that nothing in CMS's report reflects
     the condition of the pollock when it was transferred from BCS's facility to BNSF's railcar.

23

ORDER - 5

1      Plaintiffs assert that they could, at trial, present evidence that the fish was in good

2   condition when loaded into BNSF's railcar, reasoning that BCS could authenticate the

3   manifest and pre-trip inspection report that it prepared in connection with this shipment.

4   *See* Pls.' Reply at 5 & n.2 (docket no. 38); *see also* Exs. D & E to Rowan Decl. (docket

5   no. 39-1).  Plaintiffs blame BNSF for their failure to proffer BCS's deposition testimony,

6   but they do not explain why they could not obtain a declaration from BCS, which BNSF

7   was separately able to do.  *See* Roques Decl., BNSF Ex. N (docket no. 27-15).  Even if

8   authenticated, however, neither the manifest nor the pre-trip inspection report describe

9   the condition of the pollock; the manifest merely lists the lot numbers and quantities of

10   fish, as well as the temperature at 10:45 on November 10, 2020 (-10°F/-23.3°C), and the

11   pre-trip inspection report reflects only the condition of the railcar, which was clean, free

12   of rodents, insects, birds, and incompatible or hazardous materials, and pre-cooled to 0°F.

13   Exs. D & E to Rowan Decl. (docket no. 39-1).

14      When asked during his deposition about any evidence of the product's condition

15   before transport, Icicle's Rule 30(b)(6) designee indicated that Icicle must rely on BCS's

16   pre-trip summaries, and that Icicle cannot "say for sure" the fish was in good condition

17   when it left BCS's storage facility.  *See* Noll Dep. at 75:18–76:20, BNSF Ex. C (docket

18   no. 27-4).  Likewise, Webster's Rule 30(b)(6) deponent admitted that Webster has no

19   independent knowledge about the condition of the freight when it was tendered by BCS

20   to BNSF.  *See* Anderson Dep. at 39:6–40:22, BNSF Ex. S (docket no. 33-1).  Plaintiffs'

21   promise of what they might prove at trial does not warrant summary judgment, and the

22   current record does not support a finding that the cargo at issue was, as a matter of law, in

23

1  good condition when delivered to BNSF.  Rather, the condition of the pollock when it

2  was placed in BNSF's care is a factual question and, as to BNSF's liability, plaintiffs'

3  motion for summary judgment is DENIED.

4         2.      **Limitation on Liability**

5         In 1913, the Supreme Court held that the Carmack Amendment did not abrogate

6  the common law doctrine that "a carrier may, by a fair, open, just, and reasonable

7  agreement, limit the amount recoverable by a shipper in case of loss or damage to an

8  agreed value, made for the purpose of obtaining the lower of two or more rates of charges

9  proportioned to the amount of the risk."  _Adams Express Co. v. Croninger_, 226 U.S. 491,

10  509–12 (1913).  In response, Congress attempted to curtail agreements to limit liability,

11  but the initial legislation (the first Cummins[2] Amendment) was overly restrictive, and a

12  later statute (the second Cummins Amendment) quickly followed.  _See Emerson Elec._

13  _Supply Co. v. Estes Express Lines Corp._, 451 F.3d 179, 183 (3d Cir. 2006) (citing Pub. L.

14  No. 63-325, 38 Stat. 1196 (1915), and Pub. L. No. 64-183, 39 Stat. 441 (1916)).  The

15  second Cummins Amendment, originally codified as 49 U.S.C. § 20(11), allowed carriers

16  to limit their liability by filing tariffs with the Interstate Commerce Commission ("ICC").

17  The Carmack and Cummins Amendments were amended and recodified in 1995, when

18  the ICC was eliminated and the Surface Transportation Board ("STB") was created.  _See_

19

20  [2] Other cases refer to the Cummings Amendment, _see Atwood v. U W Freight Line, Inc._, 127
    F. Supp. 2d 1155, 1158 n.10 (D. Idaho 1999), but the legislation is correctly linked to Albert
21  Baird Cummins, who served three terms as a U.S. senator from Iowa, during which he was a
    member of and eventually chaired the U.S. Senate Committee on Interstate Commerce.  _See_
22  https://www.commerce.senate.gov/committeehistory.

23

1    ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995).  As it now

2    reads, the relevant statute imposes liability on receiving, delivering, and intermediary rail

3    carriers for "actual loss or injury to the property" being transported, except when liability

4    is "limited to a value established by written declaration of the shipper or by a written

5    agreement between the shipper and the carrier."  *See* 49 U.S.C. §§ 11706(a) & (c)(3)(A).

6         In *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407 (7th Cir. 1987), the Seventh

7    Circuit articulated a four-part test for determining whether a carrier has effectively

8    limited its liability for cargo damage.  *See id.* at 1415–16 (citing *Anton v. Greyhound Van*

9    *Lines, Inc.*, 591 F.2d 103 (1st Cir. 1978)).  Relying on the wording of the second

10   Cummins Amendment,[3] the *Hughes* Court identified four steps that a carrier must take to

11   limit its liability under the Carmack Amendment:  (i) maintain a tariff that complies with

12   ICC regulations; (ii) provide the shipper a reasonable opportunity to choose between two

13   or more levels of carrier liability; (iii) obtain the shipper's agreement concerning the

14   selected liability limit; and (iv) issue a receipt or bill of lading before moving the

_____

16   [3] At the time *Hughes* was decided, the second Cummins Amendment read as follows:

17        The Interstate Commerce Commission may require or authorize a carrier providing
18        transportation or service subject to its jurisdiction under subchapter I, II, or IV of
          chapter 105 of this title to establish rates for transportation of property under which
19        the liability of the carrier for that property is limited to a value established by
          written declaration of the shipper, or by a written agreement, when that value would
20        be reasonable under the circumstances surrounding the transportation.  A rate may
          be made applicable under this section to livestock only if the livestock is valuable
21        chiefly for breeding, racing, show purposes, or other special uses.  A tariff filed
          with the Commission under subchapter IV of this chapter shall refer specifically to
          the action of the Commission under this section.

22   Pub. L. No. 95-473, 92 Stat. 1337 (1978) (codified as 49 U.S.C. § 10730).

23

ORDER - 8

shipment.  *Id.* at 1412 n.6 & 1415.  The *Hughes* standard was adopted by other courts, including the Ninth Circuit, before the ICC was dissolved.  *See Hughes Aircraft Co. v. N. Am. Van Lines, Inc.*, 970 F.2d 609, 611–12 (9th Cir. 1992)[4]; *see also Rohner Gehrig Co. v. Tri-State Motor Transit*, 950 F.2d 1079, 1081 (5th Cir. 1992) (en banc); *Bio-Lab, Inc. v. Pony Express Courier Corp.*, 911 F.2d 1580, 1582 (11th Cir. 1990).

BNSF contends that, in light of the ICC Termination Act of 1995, the *Hughes* criteria no longer apply.  Indeed, the Eleventh Circuit has observed that the first element of the *Hughes* standard is "a legal impossibility" because, even before 1995, tariffs had been eliminated in connection with non-household goods, and the ICC no longer exists. *See Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1271 n.4 (11th Cir. 2001).  In a later decision, however, the Eleventh Circuit held that, notwithstanding the intervening legislative changes, the crux of the *Hughes* test, namely the requirement that the carrier give the shipper a reasonable opportunity to pick from among different levels of liability, still governs.  *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 841–42 (11th Cir. 2003).  In addition, with regard to the first *Hughes* element, the Eleventh Circuit concluded that, pursuant to the latest version of the statute, instead of a carrier filing its tariff with the defunct ICC, the carrier must provide a shipper with the carrier's tariff "if the shipper requests it."  *Id.* at 841; *see* 49 U.S.C. § 14706(c)(1)(B) (indicating that, if a motor carrier is not required to file its tariff with the STB, then it

---

[4] Although the Ninth Circuit's seminal case on the subject involves Hughes Aircraft Company, the *Hughes* test derives its name from the Seventh Circuit's 1987 decision.  *See*, *e.g.*, *Rohner*, 950 F.2d at 1081.

must provide the tariff "on request of the shipper"); *see also* 49 U.S.C. § 11101(b)

(requiring a rail carrier to "provide to any person, on request, the carrier's rates and other

service terms").  The Ninth Circuit has agreed with this reasoning, *see OneBeacon Ins.*

*Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1100 (9th Cir. 2011), and the *Hughes* standard,

as so amended, continues to control.

BNSF bears the burden of proving that it has complied with all of the *Hughes*

prerequisites for limiting its liability.  *OneBeacon*, 634 F.3d at 1099.  The parties do not

dispute that the first *Hughes* prong is satisfied; no evidence exists that Icicle (or BCS)

requested BNSF's rates and/or service terms during the relevant period, and thus, BNSF

had no obligation to disclose them at the time or shortly before the pollock at issue was

shipped.  The parties disagree, however, about whether the other three *Hughes* criteria

have been met.  Before considering the parties' respective arguments concerning the

*Hughes* elements, the Court must first examine BNSF's manner of conducting business,

which is summarized as follows.

### a.      **BNSF's Shipping Rates for Frozen Fish or Seafood**

BNSF's rate-related procedures are set forth in BNSF Rules Book 6100-B (the

"Rules Book").  Item 6120 in the Rules Book provides:

> BNSF offers the opportunity to ship temperature controlled commodities
> (Rules 705 and 710) pursuant to the terms and conditions of 49 U.S.C.
> Section 11706 (Carmack) liability, as an alternative to the claims provisions
> in this BNSF Rules Book, BNSF-6100 Series.  *Shipments made pursuant to*
> *the claim provisions of Section 11706 (Carmack) will be charged a higher*
> *rate*, and the following conditions must be met in full:
>
> 1. Not later than the time a car is ordered for loading the shipper must
>    notify BNSF or its designated representative of the intention to make

the shipment subject to the claim provision of 49 U.S.C. Section 11706 (Carmack).  At that time the shipper must advise BNSF where and when the car will be available for BNSF representatives to inspect the loading and the loading method.

2. The shipping order and receipt must be endorsed prior to the shipment, "The Shipment is subject to the Claim Terms of 49 U.S.C. Section 11706."

3. Transportation charges must be prepaid.

Unless the shipper complies in full with the conditions stated above for application of Section 11706 liability, the shipment will be conclusively deemed to move under the 'alternate liability' terms and conditions of BNSF Rules Book, BNSF-6100 Series, and there will be a conclusive presumption that the shipper has given his written declaration and/or that the shipper and carrier have entered into a written agreement to this effect.

BNSF Ex. G (docket no. 27-8 at 6) (emphasis added).  In this way, the Rules Book indicates that a higher rate will be charged for shipping with full (Carmack-level) carrier liability and that certain prerequisites must be satisfied to obtain such coverage, including payment in advance of the conveyance.

The Rules Book is available to BNSF customers who have access to BNSF's Pricing Publications Application.  Roberts Dep. at 82:4–17, Pls.' Ex. K (docket no. 28-7). Icicle did not, however, have access to the Pricing Publications Application.  _Id._ at 53:9–58:25.  The Rules Book is also available to BNSF customers via email or in hard copy form upon request.  _See_ Weber Dep. at 135:16–136:14, BNSF Ex. U (docket no. 33-3). In her deposition, Morgan Weber, who is a national account sales representative for BNSF's food and beverage team, and who has primary responsibility for communicating with Icicle, _see_ Weber Dep. at 35:18–42:16, Pls.' Ex. J (docket no. 34-2), testified that, if Icicle had requested a copy of the Rules Book, she would have provided it, _see_ Weber Dep. at 135:10–137:3, BNSF Ex. U (docket no. 33-3).

ORDER - 11

1    BNSF's non-Carmack or limited-liability shipping rates are outlined in various

2    price authorities.  *See* Mathewson Decl. at ¶ 6, BNSF Ex. E (docket no. 27-6).  The price

3    authority for frozen fish or seafood is BNSFQ 113396, which has been in effect for

4    several years, including during the period at issue in this case.  *Id.* at ¶ 8.  BNSFQ

5    113396 references the Rules Book ("Transportation under this agreement is subject to

6    BNSF Rules Book 6100-Series . . . ."), contains matrices of prices based on origin,

7    destination, and date, and sets forth "a maximum $50,000 carrier liability per rail car."

8    *See* BNSF Ex. F (docket no. 27-7).  On January 30, 2019, BNSF's sales representative

9    (Morgan Weber) sent Icicle a spreadsheet of rates set forth in BNSFQ 113396, and

10   offered to obtain quotations for any other rates that were needed, but were not published.[5]

11   *See* BNSF Ex. J (docket no. 27-11).  On February 14, 2019, Icicle acknowledged receipt

12   of Weber's email.[6]  *Id.*

13   _____

14   [5] In addition to the pricing matrix, Weber's message contained the following language:  "**RATES**
     **SUBJECT TO CHANGE WITH 30-DAYS NOTICE**," and "rate offers are subject to . . . BNSF Rules

15   Books 6100."  BNSF Ex. J (docket no. 27-11) (emphasis in original).  In response to BNSF's
     motion for partial summary judgment, plaintiffs accuse Weber of using "small, inconspicuous

16   font to minimize the chance that her client would notice" the boilerplate.  Pls.' Resp. at 11
     (docket no. 34).  Plaintiffs ignore that this standard verbiage, which appears below the signature

17   block in Weber's email, begins with capitalized and bolded font, and they cite no authority for
     their aspersions.  The Court declines to draw any negative inference from the font size of the

18   text.

19   [6] Plaintiffs contend that Icicle was never provided the applicable price authority, which was in
     effect from April 1, 2020, until April 30, 2021, *see* Ex. 1 to Mathewson Decl. (docket no. 27-6 at

20   62–74), because Icicle did not have access to the Pricing Publications Application.  *See* Pls.'
     Mot. at 11 (docket no. 28); Pls.' Resp. at 11–14 (docket no. 34).  Icicle subscribed to receive, via

21   email, updates to BNSFQ 113396, and, on April 7, 2020, BNSF sent a notification about the
     applicable price authority to the address associated with Mark Denison.  *See* Mathewson Decl. at

22   ¶¶ 23–26, BNSF Ex. E (docket no. 27-6).  Denison, however, retired from Icicle in 2011.  *See*
     Eisenhower Decl. at ¶ 4 (docket no. 35).  Whether Icicle received the April 2020 version of

23

ORDER - 12

b.   **Course of Dealings Between BNSF and Icicle**

In 2018, over two years before the spoiled fish incident, Icicle shipped, on at least 20 different occasions, rail cars of frozen fish pursuant to price authority BNSFQ 113396, receiving invoices from BNSF ranging between roughly $13,000 and $17,000 per rail car.  *See* BNSF Ex. H (docket no. 27-9).  Each invoice identified the applicable price authority as BNSFQ 113396.  *Id.*  Icicle did not dispute any of these freight bills and paid all of them.  Noll Dep. at 116:18–117:10, BNSF Ex. C (docket no. 27-4).  The invoice related to the rotten pollock at issue, which is dated December 2, 2020, also referenced BNSFQ 113396, BNSF Ex. I (docket no. 27-10), but the relevant bill of lading did not, *see* BNSF Ex. O (docket no. 27-16).  According to BNSF's Director of Cargo Claims, if a shipper fails to input the applicable price authority on the bill of lading, the "currently existing price authority will be used, which in this case is BNSFQ 113396."  Mathewson Decl. at ¶ 18, BNSF Ex. E (docket no. 27-6) (citing Rules Book, Item 2320); *see* BNSF Ex. G (docket no. 27-8 at 5) (Item 2320 reads in relevant part:  "BNSF will issue freight bills based on rates that are in effect at the time shipments are tendered to us for movement.  Please show the applicable price authority number on your bills of lading (e.g., BNSFQ12345). . . .  If no other price is in place at the time of movement, existing public prices will be used."); *see also Siren*, 249 F.3d at 1270–71 ("the concept of a

---

BNSFQ 113396 is not material; Icicle was provided the necessary information from the price authority that was in effect the previous year, and plaintiffs make no contention that the rate or other changes to BNSFQ 113396 have any relevance to the issues now before the Court.

1   carrier and shipper who agree in writing to limit the carrier's liability is not bounded by a

2   requirement that the carrier's tariff somehow be incorporated into the bill of lading").

3           The bill of lading for Icicle's November 2020 shipment was prepared by BCS on

4   Icicle's behalf.  *See* Roques Decl. at ¶¶ 12–13, BNSF Ex. N (docket no. 27-15).  The

5   following pre-printed language appeared at the top of the bill of lading:

6           Received, subject to individually determined rates or contracts that have been
            agreed to in writing between the carrier and shipper, if applicable, otherwise
7           the rates, classifications, and rules that have been established by the carrier
            and are available to the shipper on request . . . .  Shipper hereby certifies that
8           he is familiar with all the terms and conditions of the said bill of lading,
            including those on the back thereof, set forth in the classification or tariff
9           which governs the transportation of this shipment, and the said terms and
            conditions are hereby agreed to by the shipper and accepted for himself and
10          his assigns.

11  BNSF Ex. O (docket no. 27-16).  The bill of lading also contained an area in which the

12  value of the property being shipped could be declared, but Icicle had not instructed BCS

13  to state an amount, and BCS left the section blank, as shown in the excerpt below:

14

15

16



17

18  *Id.*; *see also* Roques Decl. at ¶¶ 17–18, BNSF Ex. N (docket no. 27-15).  The bill of

19  lading does not bear BNSF's contact information, BNSF's trademarks or logos, or any

20  other indicia of BNSF's involvement in crafting the document.  *See* BNSF Ex. O (docket

21  no. 27-16).  After generating the bill of lading, BCS provided a copy of it to Icicle.

22  Roques Decl. at ¶ 14, BNSF Ex. N (docket no. 27-15).

23

ORDER - 14

1    When Icicle initially submitted to BNSF a claim for cargo loss, it indicated that

2    the amount sought was $228,690.  *See* BNSF Ex. Q (docket no. 27-18); *see also* Ex. A to

3    Rowan Decl. (docket no. 39-1).  Five days later, on December 17, 2020, Icicle revised its

4    claim form to reflect the applicable price authority's $50,000 limit on BNSF's liability.

5    *See* BNSF Ex. R (docket no. 27-19).  Consistent with this amendment to its cargo loss

6    claim form, Icicle's Rule 30(b)(6) designee testified that Icicle itself "has no reason to

7    suggest" that the relevant price authority (BNSFQ 113396) "did not contain a $50,000

8    limitation of liability at any point."  *See* Noll Dep. at 122:18–25, BNSF Ex. C (docket

9    no. 27-4).

10                    c.    **Application of the *Hughes* Test**

11    Webster, however, contends that the liability limitation in BNSFQ 113396 has no

12    binding effect because (i) BNSF never explicitly discussed levels of liability with Icicle,

13    (ii) Icicle was not provided a copy of the Rules Book, and (iii) the Rules Book does not

14    state a rate associated with full (Carmack) liability or explain how such rate would be

15    calculated.  Based on these observations, Webster argues that Icicle was not provided a

16    reasonable opportunity to opt for greater coverage at a higher rate and did not agree to the

17    $50,000 liability limitation,[7] relying primarily on *Shielding Int'l, Inc. v. Oak Harbor*

18    *Freight Lines, Inc.*, 305 F. App'x 432 (9th Cir. 2008), and *Chartis Seguros Mex., S.A. de*

19    *C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171 (S.D.N.Y. 2014).

20

21    _____

22    [7] Webster also asserts that BNSF failed to issue a bill of lading, but this contention runs contrary
     to the undisputed fact that BCS, acting on Icicle's behalf, generated the necessary bill of lading.

23

ORDER - 15

1    Both cases are distinguishable.  In _Shielding_, the motor carrier's tariff, preprinted

2    bills of lading, and pricing agreements failed to mention an option to ship at a rate

3    associated with full liability for freight damage.  305 F. App'x at 433.  The motor carrier

4    contended merely that "it had 'a procedure in place' by which, 'had [the shipper]

5    inquired, it could have selected a higher limitation of liability.'"  _Id._  The Ninth Circuit

6    concluded that "[a]n unpublicized procedure for revaluing freight—one not disclosed to

7    the shipper unless the shipper thinks to ask about it—does not constitute 'offering a

8    choice' in any acceptable sense of the term."  _Id._

9    In _Chartis_, the rail carrier provided a specific price quotation for transporting two

10   electric transformers valued at over $3 million.  3 F. Supp. 3d at 176–77.  The price

11   quotation stated a maximum liability of $25,000 per rail car (each transformer required its

12   own rail car) and indicated that the price was "subject to 9012."  _Id._  The bills of lading,

13   which were on the rail carrier's forms, downloaded from its website, did not refer to

14   "9012" or provide a place where the shipper could declare the value of the cargo.  _Id._ at

15   178; _see also_ _id._ at 192 (observing that a shipper "prepares" or "drafts" a bill of lading

16   when it "creates" the document, and not when it "merely fills in the blanks" on the

17   carrier's form (quoting _Sassy Doll_, 331 F.3d at 839–40)).  In addition, "9012" was not a

18   widely known designation or industry term; rather, it was a "mysterious reference" to the

19   rail carrier's internal "Rules Publication," and the only guidance on how to locate the

20   Rules Publication on the rail carrier's website or obtain a hard copy of it was within the

21   document itself.  _Id._ at 193–94.  In light of these facts, the _Chartis_ Court denied the rail

22   carrier's motion for partial summary judgment with regard to limitation of its liability,

23

1    and granted the shipper's agent's motion to strike the rail carrier's affirmative defense

2    asserting limitation of liability.  *Id.* at 194.

3            Unlike the carriers in *Shielding* and *Chartis*, the carrier in this matter makes its

4    Rules Book available to shippers via the Pricing Publications Application or upon

5    request, and the Rules Book contains specific conditions for shipping temperature-

6    controlled items with full (Carmack) carrier liability.  The Rules Book is referenced in

7    the applicable price authority (BNSFQ 113396), as well as in emails providing rate

8    information to customers.  The record does not support any finding that Icicle was

9    unaware of the Rules Book or that BNSF kept secret the manner in which a shipper could

10   request full (Carmack) carrier liability.  Indeed, before the incident at issue, Icicle had

11   received price quotations for shipping with full liability and had opted not to use such

12   rates because they were "too high."  Ferguson Dep. at 65:5–25, BNSF Ex. D (docket

13   no. 27-5).[8]

14           Moreover, in contrast to *Chartis*, in this case, the bill of lading was generated by

15   the shipper's agent (rather than the carrier), and it had the requisite space for inputting the

16   full value of the cargo, but the line was left blank by BCS because it had not been

17   instructed by Icicle to declare a particular amount.  *Compare Chartis*, 3 F. Supp. 3d at

18

19   [8] According to Icicle's former Director of Logistics, Mark Ferguson, for purposes of Icicle's
     business, shipping "rates are king."  Ferguson Dep. at 85:22–86:2, BNSF Ex. D (docket no. 27-
20   5).  During his deposition, Ferguson explained that, pursuant to corporate policy, Icicle typically
     used "standard" or limited-liability shipping rates, and then obtained cargo insurance "on top."
21   *Id.* at 74:13–75:21.  Plaintiffs characterize Ferguson's testimony as unreliable.  *See* Pls.' Resp. at
     5–8 (docket no. 34); Pls.' Reply at 11–12 (docket no. 38).  Plaintiffs have not, however, moved
22   to strike any portion of Ferguson's deposition transcript or provided any basis for doing so.

23

1    189–92, _with_ Roques Decl. at ¶¶ 12–18, BNSF Ex. N (docket no. 27-15).  As recognized

2    by the Eleventh Circuit, courts reach different results concerning carrier liability

3    limitations depending on (i) whether the carrier or the shipper drafted the bill of lading,

4    and (ii) the structure of the bill of lading.  _See_ _Sassy Doll_, 331 F.3d at 839–40 & 842.

5    When a shipper prepares the bill of lading, the shipper is bound by any industry standards

6    incorporated within the bill of lading even when it lacks actual knowledge about the

7    terminology used because, in those circumstances, the mistake is unilateral and cannot

8    serve as a basis for reformation of the shipping contract unless the carrier consents.  _Id._ at

9    839.  This reasoning leads to the "unremarkable" conclusion that, pursuant to shipping

10   industry protocols, a "declared value box provides the [requisite] reasonable opportunity

11   to choose a higher level of liability," and a shipper's expectation that a carrier would be

12   fully liable despite a failure to declare the actual value of the shipment is "no more than a

13   unilateral mistake" on the part of the shipper.  _Id._ at 842.

14          The Carmack and Cummins Amendments and related jurisprudence are "intended

15   to protect shippers from carriers who would take advantage of their own superior

16   knowledge and leverage when dealing with unwary shippers."  _Siren_, 249 F.3d at 1271.

17   Shippers (like Icicle) need not, however, be protected from themselves.  _See_ _id._ at 1271–

18   74.  Icicle has not manifested, by word or conduct, any mistake, misunderstanding, or

19   surprise about BNSF's maximum liability.  The declared value box was intentionally left

20   blank on the bill of lading drafted by Icicle's agent (BCS), which contains an express

21   agreement to the terms and conditions of BNSF's applicable tariff.  _See_ BNSF Ex. O

22   (docket no. 27-16).  After receiving a copy of the bill of lading, Icicle did not object to its

23

1   form or alert BCS or BNSF concerning any error.  Icicle had shipped frozen product in

2   BNSF's railcars numerous times and, on each prior occasion, it had used the same

3   procedure as in this instance, namely to pay the invoiced amount, calculated pursuant to

4   the applicable price authority (BNSFQ 113396), after the shipment arrived at its

5   destination, as opposed to in advance, as would be required for full (Carmack) liability.

6   Icicle had an assigned BNSF account representative, and it knew how to obtain rate and

7   other information it desired.  It was aware that rates associated with full (Carmack)

8   liability were available and were higher than standard shipping prices.  Icicle therefore

9   relied on separate cargo insurance to cover the difference between the actual value of its

10  products and BNSF's maximum liability.  Finally, with regard to the spoiled fish at issue,

11  Icicle voluntarily altered its claim to reflect BNSF's limitation of $50,000 in damages.

12          The Court concludes that any failure on BNSF's part to explicitly discuss liability

13  options with, or provide the Rules Book to, Icicle did not, as a matter of law, deprive

14  Icicle of a reasonable opportunity to opt between levels of carrier liability.  Plaintiffs

15  argue that, even if Icicle had had a copy of the Rules Book, it could not have determined

16  the rates associated with full (Carmack) liability.  A carrier need not, however, maintain

17  its rates in any particular format or formally publish its rates; the rates must simply be

18  available to customers upon request.  *See OneBeacon*, 634 F.3d at 1100.  By indicating

19  that temperature-controlled shipments made pursuant to the provisions of the Carmack

20  Amendment "will be charged a higher rate" and will be subject to additional

21  requirements, *see* BNSF Ex. G (docket no. 27-8 at 6), the Rules Book does enough to

22  alert BNSF's clients to the availability of greater coverage.

23

**<u>Conclusion</u>**

For the foregoing reasons, the Court ORDERS:

(1)      BNSF's motion for partial summary judgment, docket no. 27, is GRANTED, and the Court rules, as a matter of law, that BNSF has met the requirements for limiting its liability to $50,000 with respect to the freight at issue;

(2)      Plaintiffs' motion for summary judgment, docket no. 28, is DENIED;

(3)      The parties are DIRECTED to file a Joint Status Report within fourteen (14) days of the date of this Order indicating when they will be ready for trial, how long trial is expected to last, and whether any issue remains for trial other than whether the pollock was in good condition when loaded into BNSF's railcar;

(4)      The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 14th day of December, 2023.

Thomas S. Zilly
United States District Judge

ORDER - 20